IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

| | | |
|---|---|---|
| **DARCEL DENISE CHAMBERS** § | | |
| § | | |
| vs. § | CIVIL ACTION NO. 6:17cv669 | |
| § | | |
| **NANCY A. BERRYHILL** § | | |
| § | | |

## MEMORANDUM OPINION AND ORDER

On November 29, 2017, Plaintiff initiated this lawsuit by filing a complaint seeking judicial review of the Commissioner's decision denying her application for Social Security benefits. The matter was transferred to the undersigned with the consent of the parties pursuant to 28 U.S.C. § 636. For the reasons below, the Commissioner's final decision is **REVERSED** and **REMANDED** pursuant to sentence four of 42 U.S.C. § 405(g) for further consideration consistent with this opinion.

### PROCEDURAL HISTORY

Plaintiff protectively filed an application for Disability Insurance Benefits and an application for Supplemental Security Income on January 27, 2014, alleging a disability onset date of March 6, 2013. The applications were denied initially and on reconsideration. Plaintiff filed a request for a hearing before an Administrative Law Judge ("ALJ"). An ALJ conducted a hearing on January 14, 2016, and then conducted a supplemental hearing on September 19, 2016. The ALJ issued a decision on October 27, 2016, concluding that Plaintiff was not disabled prior to February 16, 2016, but became disabled on that date and has continued to be disabled through the date of the decision. Plaintiff submitted a request for review of the ALJ's decision. The Appeals

Council denied the request for review on October 6, 2017. As a result, the ALJ's decision became that of the Commissioner. Plaintiff filed this lawsuit on November 29, 2017, seeking judicial review of the Commissioner's decision.

**STANDARD**

Title II of the Act provides for federal disability insurance benefits. Title XVI of the Act provides for supplemental security income for the disabled. The relevant law and regulations governing the determination of disability under a claim for disability insurance benefits are identical to those governing the determination under a claim for supplemental security income. *See Davis v. Heckler*, 759 F.2d 432, 435 n. 1 (5th Cir. 1983); *Rivers v. Schweiker*, 684 F.2d 1144, 1146, n. 2 (5th Cir. 1982); *Strickland v. Harris*, 615 F.2d 1103, 1105 (5th Cir. 1980).

Judicial review of the denial of disability benefits under section 205(g) of the Act, 42 U.S.C. § 405(g), is limited to "determining whether the decision is supported by substantial evidence in the record and whether the proper legal standards were used in evaluating the evidence." *Bowling v. Shalala*, 36 F.3d 431, 435 (5th Cir. 1994) (quoting *Villa v. Sullivan*, 895 F.2d 1019, 1021 (5th Cir. 1990)); *Muse v. Sullivan*, 925 F.2d 785, 789 (5th Cir. 1991) (*per curiam*). A finding of no substantial evidence is appropriate only where there is a conspicuous absence of credible choices or no contrary medical evidence. *Johnson v. Bowen*, 864 F.2d 340, 343–44 (5th Cir. 1988) (citing *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983)). Accordingly, the Court "may not reweigh the evidence in the record, nor try the issues *de novo*, nor substitute [the Court's] judgment for the [Commissioner's], even if the evidence preponderates against the [Commissioner's] decision." *Bowling*, 36 F.3d at 435 (quoting *Harrell v. Bowen*, 862 F.2d 471, 475 (5th Cir. 1988)); *see Spellman v. Shalala*, 1 F.3d 357, 360 (5th Cir. 1993); *Anthony v. Sullivan*, 954 F.2d 289, 295 (5th Cir. 1992); *Cook v. Heckler*, 750 F.2d 391, 392 (5th Cir. 1985). Rather,

conflicts in the evidence are for the Commissioner to decide. *Spellman*, 1 F.3d at 360 (citing *Selders v. Sullivan*, 914 F.2d 614, 617 (5th Cir. 1990)); *Anthony*, 954 F.2d at 295 (citing *Patton v. Schweiker*, 697 F.2d 590, 592 (5th Cir. 1983)). A decision on the ultimate issue of whether a claimant is disabled, as defined in the Act, rests with the Commissioner. *Newton v. Apfel*, 209 F.3d 448, 455–56 (5th Cir. 2000); Social Security Ruling ("SSR") 96-5p.

"Substantial evidence is more than a scintilla but less than a preponderance—that is, enough that a reasonable mind would judge it sufficient to support the decision." *Pena v. Astrue*, 271 Fed. Appx. 382, 383 (5th Cir. 2003) (citing *Falco v. Shalala*, 27 F.3d 160, 162 (5th Cir. 1994)). Substantial evidence includes four factors: (1) objective medical facts or clinical findings; (2) diagnoses of examining physicians; (3) subjective evidence of pain and disability; and (4) the plaintiff's age, education, and work history. *Fraga v. Bowen*, 810 F.2d 1296, 1302 n. 4 (5th Cir. 1987). If supported by substantial evidence, the decision of the Commissioner is conclusive and must be affirmed. *Richardson v. Perales*, 402 U.S. 389, 390, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971). However, the Court must do more than "rubber stamp" the Administrative Law Judge's decision; the Court must "scrutinize the record and take into account whatever fairly detracts from the substantiality of evidence supporting the [Commissioner's] findings." *Cook*, 750 F.2d at 393 (5th Cir. 1985). The Court may remand for additional evidence if substantial evidence is lacking or "upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." 42 U.S.C. § 405(g); *Latham v. Shalala*, 36 F.3d 482, 483 (5th Cir. 1994).

A claimant for disability has the burden of proving a disability. *Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991). The Act defines "disability" as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can

be expected to result in death or which can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 416(i)(1)(A) and 423(d)(1)(A). A "physical or mental impairment" is an anatomical, physiological, or psychological abnormality which is demonstrable by acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B).

In order to determine whether a claimant is disabled, the Commissioner must utilize a five–step sequential process. *Villa*, 895 F.2d 1022. A finding of "disabled" or "not disabled" at any step of the sequential process ends the inquiry. *Id.*; see *Bowling*, 36 F.3d at 435 (citing *Harrell*, 862 F.2d at 475). Under the five–step sequential analysis, the Commissioner must determine at Step One whether the claimant is currently engaged in substantial gainful activity. At Step Two, the Commissioner must determine whether one or more of the claimant's impairments are severe. At Step Three, the commissioner must determine whether the claimant has an impairment or combination of impairments that meet or equal one of the listings in Appendix I. Prior to moving to Step Four, the Commissioner must determine the claimant's Residual Functional Capacity ("RFC"), or the most that the claimant can do given his impairments, both severe and non–severe. Then, at Step Four, the Commissioner must determine whether the claimant is capable of performing his past relevant work. Finally, at Step Five, the Commissioner must determine whether the claimant can perform other work available in the local or national economy. 20 C.F.R. §§ 404.1520(b)–(f). An affirmative answer at Step One or a negative answer at Steps Two, Four, or Five results in a finding of "not disabled." *See Villa*, 895 F.2d at 1022. An affirmative answer at Step Three, or an affirmative answer at Steps Four and Five, creates a presumption of disability. *Id*. To obtain Title II disability benefits, a plaintiff must show that he was disabled on or before the last day of his insured status. *Ware v. Schweiker*, 651 F.2d 408, 411 (5th Cir. 1981), *cert denied*, 455 U.S. 912, 102 S.Ct. 1263, 71 L.Ed.2d 452 (1982). The burden of proof is on the claimant for

the first four steps, but shifts to the Commissioner at Step Five if the claimant shows that he cannot perform his past relevant work. *Anderson v. Sullivan*, 887 F.2d 630, 632–33 (5th Cir. 1989) (*per curiam*).

The procedure for evaluating a mental impairment is set forth in 20 CFR §§ 404.1520a and 416.920a (the "special technique" for assessing mental impairments, supplementing the five-step sequential analysis). First, the ALJ must determine the presence or absence of certain medical findings relevant to the ability to work. 20 CFR §§ 404.1520a(b)(1), 416.920a(b)(1). Second, when the claimant establishes these medical findings, the ALJ must rate the degree of functional loss resulting from the impairment by considering four areas of function: (a) activities of daily living; (b) social functioning; (c) concentration, persistence, or pace; and (d) episodes of decompensation. 20 CFR §§ 404.1520a(c)(2–4), 416.920a(c)(2–4). Third, after rating the degree of loss, the ALJ must determine whether the claimant has a severe mental impairment. 20 CFR §§ 404.1520a(d), 416.920a(d). If the ALJ's assessment is "none" or "mild" in the first three areas of function, and is "none" in the fourth area of function, the claimant's mental impairment is "not severe, unless the evidence otherwise indicates that there is more than a minimal limitation in [the claimant's] ability to do basic work activities." 20 CFR §§ 404.1520a(d)(1), 416.920a(d)(1). Fourth, when a mental impairment is found to be severe, the ALJ must determine if it meets or equals a Listing. 20 CFR §§ 404.1520a(d)(2), 416.920a(d)(2). Finally, if a Listing is not met, the ALJ must then perform a residual functional capacity assessment, and the ALJ's decision "must incorporate the pertinent findings and conclusions" regarding the claimant's mental impairment, including "a specific finding as to the degree of limitation in each of the functional areas described in [§§ 404.1520a(c)(3), 416.920a(c)(3)]." 20 CFR §§ 404.1520a(d)(3) and (e)(2), 416.920a(d)(3) and (e)(2).

# ALJ'S FINDINGS

The ALJ made the following findings in his October 27, 2016 decision:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2016.

2. The claimant has not engaged in substantial gainful activity since the alleged onset date (20 CFR § 404.1571 *et seq.* and 416.971 *et seq.*).

3. Since the alleged onset of disability, March 6, 2013, the claimant has had the following severe impairments: degenerative disc disease of the spine, degenerative joint disease bilateral knees, affective disorder, and anxiety disorder (20 CFR 404.1520(c) and 416.920(c)).

4. Since the alleged onset date of disability, March 6, 2013, the claimant has not had an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the undersigned finds that prior to February 16, 2016, the date the claimant became disabled, the claimant had the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c) in that she can lift and/or carry 50 pounds occasionally and 25 pounds frequently; stand and/or walk 6 hours of an 8 hour workday and sit for 6 hours of an 8 hour workday. However, she was limited to performing simple, repetitive tasks.

6. After careful consideration of the entire record, the undersigned finds that beginning on February 16, 2016, the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) in that she can lift and/or carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk 6 hours of an 8 hour workday and sit for 6 hours of an 8 hour workday. She is, mentally, limited to performing simple, repetitive tasks.

7. Since March 6, 2013, the claimant has been unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

8. Prior to the established disability onset date, the claimant was an individual of advanced age. The claimant's age category has not changed since the established disability onset date (20 CFR 404.1563 and 416.963).

9. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

10. Prior to February 16, 2016, transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled" whether or not the claimant has transferable job skills. Beginning on February 16, 2016, the claimant has not been able to transfer job skills to other occupations (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

11. Prior to February 16, 2016, considering the claimant's age, education, work experience and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a).

12. Beginning on February 16, 2016, considering the claimant's age, education, work experience, and residual functional capacity, there are no jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1560(c), 404.1566, 416.960(c), and 416.966).

13. The claimant was not disabled prior to February 16, 2016, but became disabled on that date and has continued to be disabled through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

## ADMINISTRATIVE RECORD

*Administrative Hearings*

Plaintiff testified at her hearing before the ALJ on January 14, 2016. Plaintiff testified that, most recently, she worked at Sam's Club as a door greeter for about five weeks between May and June 2013. She stated that she was originally hired as a cashier, but the standing was too strenuous for her. Her work prior to that involved office work and phone work. Plaintiff acknowledged that she was incarcerated for six months in 2011 for a DUI offense, but she stated that she has not used alcohol since her offense conduct in 2009 and has never used illegal drugs.

Plaintiff testified that she walks with a cane because of knee pain. She stated that the left is worse than the right and her doctor ordered a brace for her left knee. Injections initially seemed to help and gave her more flexibility in her knee, but she has not had one since July 2015. She

also has not been prescribed a cane, but she stated that her doctor recommended one because she felt like she would fall.

Plaintiff also stated that she has pain in her lower back due to deteriorating bone loss. She described pain across her low back, radiating down her left side, with numbness in both feet. Pain medicine helps dull her pain. Plaintiff explained that her back hurts if she stands or walks too long and her knees hurt when she sits and bends them too long. She estimated that she can stand for five minutes without a cane and approximately ten to fifteen minutes with a cane. She cannot bend, push, pull, or lift and she has a weak grip. She cannot tie her shoes or type on a typewriter. Plaintiff stated that she has changed doctors multiple times due to changing locations because she is relying on family members to give her a place to stay. She also testified that she has uncontrolled high blood pressure that causes her to have severe headaches.

Plaintiff testified that she receives treatment for depression, hears voices and sees things. She stated that she was treated with lithium, but she had to stop taking it due to its side effects. Some days, her depression causes her to stay in bed without bathing, brushing her teeth, or changing clothes. Plaintiff testified that she is irritable, and it gets worse when she is around people. She does not sleep well and she has to take medication to help her sleep. Plaintiff testified that all of these factors cause her to have difficulty with concentration.

The ALJ ordered a consultative examination and re-convened Plaintiff's hearing on September 19, 2016. A vocational expert witness, Dr. Talesia Beasley, testified at Plaintiff's hearing. Dr. Beasley classified Plaintiff's past work as: (1) payroll clerk, DOT 215.382-014, sedentary, SVP 4; and (2) sales clerk, DOT 290.477-014, light, SVP 3. Presented with a hypothetical individual of Plaintiff's age, education, and work background who is limited to simple, routine tasks, consistent with unskilled work as learned by rote, with few workplace

changes, little judgment required, simple and direct supervision, and no more than occasional contact with the general public, Dr. Beasley stated that the individual could not perform Plaintiff's past work.

The ALJ then presented the same hypothetical individual, limited to medium work, who can occasionally lift and carry fifty pounds, frequently lift and carry twenty-five pounds, stand and walk for six hours of an eight-hour day, and sit for six hours in an eight-hour day, with no push or pull limitations. Dr. Beasley identified that following jobs that the hypothetical individual could perform: (1) box bender, DOT 641.687-010, medium, SVP 1, with 4,715 jobs in Texas and 68,332 jobs in the national economy; (2) hat and cap burlap spreader, DOT 581.687-022, medium, SVP 1, with 3,439 jobs in Texas and 41,165 jobs in the national economy; and (3) dust mill operator, DOT 581.686-030, medium, SVP 1, with 3,674 jobs in Texas and 48,722 jobs in the national economy. If the hypothetical individual is reduced to light work or sedentary work, Plaintiff's past work would be precluded.

Dr. Beasley testified that an individual who has difficulty maintaining attention and concentration for extended periods, up to two hours, ten to fifteen percent of the time, would not be able to perform competitive work. Similarly, if the individual is unable to complete a normal workday and work week without interruption from psychologically based symptoms and to perform at a consistent pace, without an unreasonable number and length of rest periods, Dr. Beasley stated that she could not perform competitive work.

*Medical Record*

Plaintiff received mental health services at Metrocare Services beginning in 2011. She was in group rehabilitation to develop coping and relational skills and to prevent an addiction relapse. On February 12, 2013, Plaintiff reported that she was off of her medication and she was

experiencing a depressed mood and sadness. At a return visit on March 12, 2013, she had a stable mood and no depressive signs or symptoms. When she returned on April 8, 2013, and again on May 21, 2013, she was sad, angry, and irritable with low motivation. On July 29, 2013, she was described as having a stable mood and no depressive symptoms.

A blood test on June 11, 2013 showed an elevated rheumatoid factor. Plaintiff was seen by Dr. Sukanya Ravi for an initial consultation on June 16, 2013 for pain in her joints. Plaintiff's musculoskeletal examination showed a normal range of motion and no tenderness. She was prescribed methocarbamol and Dr. Ravi ordered labs. A June 17, 2013 X-Ray of Plaintiff's knees showed mild degenerative changes of the knees. On July 3, 2013, Plaintiff returned to Dr. Ravi for hypertension and a rash believed to be caused by Plaintiff's medication. She had a normal mood and affect. Plaintiff was prescribed metoprolol tartrate for her hypertension, triamcinolone cream for her rash and cyclic citrullinated peptide antibody for the elevated rheumatoid factor. At a blood pressure check with Dr. Sentayehu Kassa on August 18, 2013, Plaintiff's hypertension was better controlled and she was advised to take her medication as directed.

A September 24, 2013 bone density scan showed osteopenia with a ten year risk of major osteoporotic fracture of 11.4%. Plaintiff had a lumbar spine CT on November 4, 2013 that showed mild degenerative changes of the lumbar spine without significant neural foraminal or spinal canal stenosis. Plaintiff also had a left knee X-Ray on November 4, 2013 that showed mild joint space narrowing of the medial compartment, unchanged compared to a prior X-Ray. On November 21, 2013, Plaintiff was referred to the pain clinic for her knee and back pain.

Plaintiff went to the emergency room with back pain on December 16, 2013. Dr. Mo noted that Plaintiff was seen in the emergency department on November 4, 2013 for the same symptoms, that improved with pain medication. She was given a morphine injection and valium.

Plaintiff returned to Dr. Ravi on January 6, 2014, complaining of back pain. Plaintiff did not have musculoskeletal tenderness. Dr. Ravi prescribed naproxen for low back pain and changed Plaintiff's hypertension medication to amlodipine. When Plaintiff saw Dr. Ravi again on March 7, 2014, she reported knee pain and continued low back pain. Plaintiff's low back had a limited range of motion, but no tenderness. Straight leg raises were negative. Dr. Ravi changed Plaintiff's medication to gabapentin for knee and back pain.

Plaintiff went to the emergency room on April 5, 2014, following a motor vehicle accident. Plaintiff stated that she rolled into the car in front of her going one to two miles per hour. The provider notes state that Plaintiff requested morphine and hydrocodone several times during her examination. Plaintiff had normal range of motion in her knees and other joints. The lumbar paraspinal muscles were tender to palpation. She was diagnosed with a muscle strain.

Plaintiff continued receiving counseling services at Metrocare Services, as well as psychiatric care by Dr. Kazia Luszczynska. She often reported depressive symptoms, mood swings, irritability, racing thoughts, hyperarousal, and hearing voices. Her medications included lithium, loxitane and doxepin. On April 30, 2014, Dr. Luszczynska noted that Plaintiff was cooperative and she had an appropriate psychomotor appearance, normal speech, fair insight, and goal directed thought process. She also had signs of psychotic features and reported auditory hallucinations. Her diagnosis included major depressive disorder with psychotic features.

On May 22, 2014, Plaintiff had a psychological assessment for cognitive and emotional factors that support or impede success in vocational training for the Department of Assistive and Rehabilitative Services. Kim Johnson, Psy.D., licensed psychologist, supervised the assessment. Plaintiff exhibited a relaxed posture and slow gait with the use of cane. Her mood was depressed with congruent affect. She was cooperative, made good eye contact, had appropriate hygiene, her

speech was appropriate and she did not exhibit any involuntary movements. Testing reflected intellectual functioning within the low average range and fine motor skills, visual motor skills, working memory, recognition, and attention (encoding) in the low average range. Academic achievement testing showed that Plaintiff was average in word reading, sentence comprehension, math computation, and reading composite, and high average in spelling. For psychological functioning, the psychologist noted that certain indicators showed that Plaintiff may not have answered in a completely forthright manner. For example, she exhibited defensiveness about personal shortcomings and an exaggeration of certain problems. She consistently endorsed items that would portray her in a negative light. Plaintiff showed anxiety and described depressive symptoms, but did not report any antisocial behavior, problems with empathy, or unusually elevated mood or heightened activity. The evaluation states that Plaintiff appeared motivated to obtain and maintain employment and had the intellectual and academic ability to successfully complete a training, vocational, or academic program. It was recommended, however, that she receive therapy before going to work.

  Plaintiff had a follow up for hypertension on June 10, 2014 with Dr. Ravi. Plaintiff did not have any musculoskeletal tenderness, but her range of motion was restricted in the left knee and low back. Plaintiff's amlodipine was increased for her hypertension and she was advised to follow up with the pain clinic for her pain complaints. Plaintiff went to the emergency department on July 14, 2014 with left knee pain. On examination, Plaintiff had normal musculoskeletal range of motion, but moderate tenderness and limited active/passive range of motion in the affected knee. She exhibited a mildly antalgic gait. An X-Ray of the knee showed mild degenerative changes without acute osseous or soft tissue abnormality.

At a return visit with Metrocare Services on June 4, 2014, Dr. Luszczynska recommended Effexor for depression. She noted that no services were needed or requested. Dr. Sickorez discussed Plaintiff's symptoms and medications with Plaintiff on July 24, 2014. She recommended discontinuing Seroquel during the daytime due to over-sedation and discontinuing Effexor due to nausea. She started Plaintiff on Symbalta and recommended only taking Klonopin as needed.

A treatment note from Dr. John Alexander on August 12, 2014 states that his examination showed ambiguous McMurray's finding in the left knee, tenderness to palpation along the joint line and pain throughout passive range of motion with mild crepitus. He noted that imaging showed some degeneration and recommended a steroid injection. Dr. Alexander also observed that CT imaging of Plaintiff's lower spine was fairly benign, showing some disc degeneration at L3-L4. He started Plaintiff on an NSAID and muscle relaxer. Dr. Alexander encouraged Plaintiff to continue mental health treatment at Metrocare. Plaintiff denied having hallucinations at that time and stated that her mental health symptoms were well-controlled.

Plaintiff was given a physical therapy treatment plan on September 3, 2014 for back pain. She was discharged from physical therapy on September 8, 2014 due to achieving her goals. She was advised to continue daily exercises, utilize proper posture and body mechanics, stop smoking, and initiate a water exercise program.

Plaintiff complained of back pain in the emergency room on November 9, 2014. Her musculoskeletal examination revealed a normal range of motion and tenderness in the left knee. Plaintiff's provider noted that an October 15, 2014 X-Ray showed mild degenerative changes in the left knee and explained that the emergency room is not appropriate for chronic pain management with narcotics.

A pain management follow up note by Dr. Miguel Prada on December 11, 2014 states that Plaintiff reported 60% improvement in pain for four weeks following knee injections. He recommended another left knee injection, heating pad, exercises, methocarbamol and etodolac as needed. On April 30, 2015, another injection was recommended and Plaintiff was prescribed gabapentin. She was also advised to continue home exercises and ambulation.

At a return visit with Dr. Luszczynska on January 5, 2015, Plaintiff reported continued depression while taking Cymbalta. Dr. Luszczynska continued Plaintiff on Cymbalta and Seroquel and added Lamictal for depression. Plaintiff had suspected side effects from Lamictal and it was discontinued on March 4, 2015. On May 7, 2015, Plaintiff reported irritability and poor sleep with audible hallucinations. Dr. Luszczynska continued Plaintiff on Seroquel and clonazepam as needed for anxiety and cautioned Plaintiff against using these medications with any pain pills or muscle relaxers.

Plaintiff went to the emergency room on May 28, 2015 with an acute exacerbation of chronic low back pain and knee pain. Plaintiff received Norco and Valium and was discharged.

After moving to Longview, Plaintiff sought mental health care at Community Healthcore. She was placed on a waiting list for services on October 27, 2015. A mental status examination on December 22, 2015 showed orientation to person, place, time, and situation, appropriate rapport, mood within normal limits, euthymic affect, normal speech, coherent thought content and process, good insight and judgment, no gross deficits in cognition, attention, or concentration, and normal psychomotor activity. Her mental status exam was unchanged on March 8, 2016 and May 24, 2016. On July 7, 2016, she had poor eye contact, a depressed mood and affect, and auditory hallucinations. Plaintiff was linked for skills training, but she reported that she did not want skills training.

Plaintiff was seen at Wellness Pointe on November 2, 2015 for medication refills. Plaintiff also reported being in a motor vehicle accident. Dr. Villafria recommended heat, a muscle relaxant, and pain medication. He prescribed cyclobenzaprine and meloxicam. Plaintiff returned on December 2, 2015 and stated that she was not feeling any better.

Plaintiff was examined by a rheumatologist, Dr. Kayvan Kamali, on December 10, 2015. X-Rays of the right and left knees showed mild osteoarthritis of the patellofemoral compartment. X-Rays of the hands showed no osseous arthritic changes. On examination, Plaintiff had good range of motion in her wrists, elbows and shoulders. There were no crepitations or effusions in the knees and no ankle synovitis or metatarsophalangeal tenderness. Plaintiff grimaced with external rotation of the shoulders, flexion of the knees, and external rotation of the hips. Dr. Kamali recommended a work up for possible secondary fibromyalgia syndrome, Mobic, and weight loss. When Plaintiff returned on December 29, 2015, Dr. Kamali assessed a possible seropositive rheumatoid arthritis, degenerative joint disease of the feet, knees, and lumbar spine, fibromyalgia syndrome, Vitamin D deficiency, elevated AST, and low TSH. He continued Plaintiff on Mobic and recommended corticosteroid injections. Dr. Kamali also encouraged aerobic exercise activity and advised smoking cessation. An MRI of the left wrist on January 20, 2016 showed moderate third metacarpal head erosion, nonspecific. Dr. Kamali then started treatment for seropositive rheumatoid arthritis. At follow up visits on May 4, 2016 and June 9, 2016, Dr. Kamali opined that Plaintiff's rheumatoid arthritis was well controlled.

Plaintiff had a consultative examination by Dr. Mahmood Panjwani on February 16, 2016. Plaintiff's neurological examination was normal, including hand grip, fine finger movements, motor strength, sensory exam, and the ability to handle small objects. Plaintiff was unable to bend down and did not attempt to squat or heel and toe stand or walk. She exhibited difficulty putting

full weight on one leg or the other and had decreased range of motion and crepitus in both knees without any acute findings. Knee flexion caused discomfort and pain. Dr. Panjwani diagnosed osteoarthritis with bilateral knee pain and low back pain. Plaintiff reported difficulty standing and walking for extended periods of time and difficulty squatting and kneeling.

Dr. Panjwani completed a Medical Source Statement of Ability to do Work-Related Activities (Physical). He opined that Plaintiff can frequently lift and carry ten pounds, occasionally lift and carry twenty pounds, sit for a total of six hours, stand for a total of four hours, and walk for a total of two hours in an eight-hour workday. He also stated that Plaintiff requires the use of a cane to ambulate. Dr. Panjwani limited pushing and pulling to "frequently" and the operation of foot controls to "occasionally." He also limited Plaintiff to occasional climbing of stairs, ramps, ladders, and scaffolds, balancing and stooping and never kneeling, crouching or crawling. Dr. Panjwani opined that Plaintiff can occasionally be exposed to unprotected heights, moving mechanical parts, and operating a motor vehicle, and frequently be exposed to humidity and wetness, dust, odors, fumes and pulmonary irritants, extreme cold, extreme heat, and vibrations.

Jane Ball, MSPT, Good Shepherd Occupational Medicine, completed a Functional Capacity Evaluation on June 1, 2016. Ms. Ball evaluated Plaintiff's physical effort, pain and disability reports, grip strength and handling, mobility, and sustained activity and positional tolerances over a two-hour period. Ms. Ball opined that, if Plaintiff returned to work, she would perform best in an occupation that allows frequent postural changes and offers a self-paced environment. She concluded that Plaintiff "most likely would not tolerate an 8 hour day."[1] Ms.

---

[1] *See* Administrative Record, ECF 14-10, at *7 (Bates stamp p. 1232).

Ball additionally opined that Plaintiff's mobility, strength, and functional tolerances would improve if she participates in an on-going home exercise program.

## DISCUSSION AND ANALYSIS

In her brief, Plaintiff presents one issue for review: [2]

> When a disability applicant's progressive illness has no clear onset of disability, the ALJ must retain a medical expert to determine the date the claimant's disability began. In this case, Plaintiff alleged she became disabled on March 6, 2013 due to degenerative arthritis, depression, and anxiety. Did the ALJ err by finding Plaintiff disabled no earlier than February 16, 2016 when no medical expert endorsed that onset date?

Plaintiff submits that the ALJ violated SSR 83-20 by issuing an arbitrary onset of disability date without seeking the assistance of a medical advisor. Plaintiff argues that her impairments of degenerative joint disease, degenerative disc disease, depression, and anxiety are slowly progressive impairments that worsen over time. Plaintiff asserts that the ALJ wrongly chose the date of the consultative examination for the onset of disability, when the consultative examiner did not express an opinion concerning when Plaintiff's limitations reached the level that was assessed. Indeed, Plaintiff points out that the consultative examiner did not review the medical record and could not have assessed when her limitations reached the level at which they were assessed on February 16, 2016.

In response, the Commissioner denies that the record shows a "slowly progressive" impairment and asserts that the record does not document Plaintiff's physical limitations prior to the consultative examination. The Commissioner submits, for example, that the consultative examiner's report is the first indication in the record that Plaintiff required the use of a cane. The Commissioner points to examination findings in 2013 and 2014 showing Plaintiff with a normal range of motion and a normal gait. The Commissioner contends that the ALJ was not required to

---

[2] *See* Plaintiff's Brief on Review of the Social Security Administration's Denial of Benefits, ECF 21, at *4.

use a medical expert to ascertain Plaintiff's disability onset date because the record prior to February 16, 2016 did not support an RFC below medium exertion.

Concerning Plaintiff's physical impairments, the record includes an assessment by a State agency physician on September 15, 2014, finding that Plaintiff can perform at the medium exertional level, and the consultative examiner's opinion on February 16, 2016, stating that she can perform work functions at the light exertional level. There are no functional assessments between September 15, 2014 and February 16, 2016 and there are no treating physician opinions. The ALJ determined that Plaintiff's onset of disability date was February 16, 2016, when the consultative examiner concluded that she could perform work at the light exertional level.

Pursuant to Social Security Ruling 83-20, 1983 WL 31249, the Commissioner considers the claimant's statement concerning when disability began, when the claimant stopped working, and the medical evidence to determine onset of disability with nontraumatic origin. "With slowly progressive impairments, it is sometimes impossible to obtain medical evidence establishing the precise date an impairment became disabling." *Id*. In *Spellman v. Shalala*, 1 F.3d 357 (5th Cir. 1993), the Court considered whether the ALJ's determination of onset of disability was arbitrary and not based on informed judgment as required by SSR 83-20. Specifically, the Court considered the determination in the context of a slowly progressive impairment. The Court stated:

> Because a correct determination of the onset date of a disability is critical, *see* SSR 83-20, we agree with the Sixth and Ninth Circuits' interpretation of SSR 83-20. We therefore hold that in cases involving slowly progressive impairments, when the medical evidence regarding the onset date of a disability is ambiguous and the Secretary must infer the onset date, SSR 83-20 requires that the inference be based on an informed judgment. The Secretary cannot make such an inference without the assistance of a medical advisor.

*Id*. at 362. Degenerative changes and depression are generally "slowly progressing." *See Kettering v. Astrue*, 940 F.Supp.2d 521 (S.D.Tex. Apr. 12, 2013).

Here, Plaintiff's disabilities are of nontraumatic origin. The record shows worsening symptoms and supports Plaintiff's assertion that her impairments are slowly progressive impairments. At some point after the 2014 assessment of Plaintiff's functional abilities, her condition worsened from being able to perform work functions at the medium exertional level to being able to perform work functions at the light exertional level. The consultative examiner performing the February 16, 2016 evaluation did not offer an opinion concerning when Plaintiff's functional ability reached the level assessed and he did not review any of Plaintiff's prior records. The record is ambiguous as to when Plaintiff's limitations first became disabling.

It was not proper for the ALJ to infer the onset date based merely on the consultative examiner's assessment on the date of his examination. The focus is on the date disability began, not the date that the claimant first had a disabling diagnosis. *See Paxson o/b/o Paxson v. Berryhill*, 2018 WL 1229844 (S.D.Tex. Mar. 8, 2018). The ALJ's written decision does not show that he reviewed the record to determine whether it supported an onset date prior to the consultative examination. Instead, he merely adopted the date of the consultative examination and stated that his residual functional capacity assessment was "supported by the totality of the evidence of record and opinion of the consultative examiner."[3] Pursuant to SSR 83-2, the ALJ was required to infer the onset date based on an informed judgment, which required the assistance of a medical advisor. *Spelling v. Shalala*, 1 F.3d at 362.

For the reasons identified, the ALJ's decision is not supported by substantial evidence. As a result, the decision of the ALJ denying benefits must be reversed. *See Carey v. Apfel*, 230 F.3d 131, 143 (5th Cir. 2000). The error requires a remand to redetermine the onset date of Plaintiff's disability with the assistance of a medical advisor in accordance with SSR 83-20. It is therefore

---

[3] *See* Administrative Record, ECF 14-2, at *23 (Bates stamp p. 22).

**ORDERED** that the Commissioner's final decision is **REVERSED** and **REMANDED** to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g) for further consideration consistent with the findings above.

So ORDERED and SIGNED this 26th day of September, 2019.

_____
K. NICOLE MITCHELL
UNITED STATES MAGISTRATE JUDGE